Roberts *vs.* Summers *et al.*

---

GABRIEL B. ROBERTS, administrator, plaintiff in error, *vs.* SARAH SUMMERS *et al.*, defendants in error.

1. On the trial before a jury of exceptions to an auditor's report, the report is, *prima facie*, true as to the facts and results reported. The fact that the rule of reference provides that any exceptions filed were to be tried *de novo*, as in cases of appeal, does not vary the rule.

2. It is not sufficient to except generally to an auditor's report, in matters of account referred to him, as erroneous in the results at which he arrives. The exception should point out wherein the error consists.

3. In Georgia, on the trial by a jury of exceptions to an auditor's report, evidence, other than that laid before the auditor, is admissible.

4. It is not a *devastavit* on the part of an administrator who has obtained an injunction preventing the distributees of the estate from suing him, to settle in Confederate funds belonging to the estate, with certain of the distributees who are willing to, and do, accept such funds at par in payment of their distributive shares, and fail to settle with others who make no demand on him till after the war, provided he retain a sufficient amount of similar assets to settle with the others, even though such assets afterwards perish on his hand without fault on his part.

5. Where one of the matters in controversy between an administrator and the distributees of his intestate, is whether the delay in the settlement of the estate, and the losses consequent upon said delay, resulted from the failure of the administrator to comply strictly with the provisions of the law, and that, with other matters, is referred to an aud-

Roberts *vs.* Summers *et al.*

itor, who, as to that, reports in favor of the administrator, and the distributees file no exceptions to the report, it is error in the Court, by his charge, to submit that issue to a jury impanneled to try certain exceptions filed by the administrator to other parts of the report.

6. If the auditor allowed an investment by the administrator of $24,000 00 in Confederate States securities as correct, to which the administrator filed no exceptions, the jury may still take such investment into consideration, if it will aid them in arriving at a correct result as to any of the exceptions filed.

7. It is error in the Court to charge the jury, where the estate is not ready to be distributed, that "it was the duty of the administrator to put the solvent notes of the estate in suit within a reasonable time after they became due, and if he did not do so within a reasonable time, and the debts were lost, then he is responsible for such loss," without qualifying such charge by adding, if the notes were lost by reason of such failure to sue.

8. If an administrator send Confederate money belonging to the estate to one of the distributees of his intestate by a person not authorized by such distributee to receive it, and the distributee refuse to accept it, but the person receiving it fails to return it to the administrator, the latter is chargeable with the true value of the money at the time it was sent, and not with its nominal value, where it does not appear the administrator received it improperly in payment of a debt due the estate.

9. An administrator is bound to use the utmost diligence to secure debts due the estate. Hence, if the makers of notes belonging to the estate, solvent at the making of the notes and for some time afterwards, become suddenly insolvent, it is his duty to put the notes promptly in suit, when there is any reasonable prospect of securing their payment by so doing.

10. When an administrator sues a note belonging to the estate, the makers of which are solvent at the time suit is brought, which suit is enjoined by one of the makers, and remains so until all the makers become insolvent, and no *laches* is properly chargeable upon the administrator, the latter is not liable to make good the loss to the estate.

Auditor's report. Exceptions. Evidence. Distribution. *Devastavit.* Confederate States securities. Investment. Diligence. Before Judge COLE. Bibb Superior Court. October Adjourned Term, 1871.

For the facts of this case, see the opinion.

B. HILL; W. K. DeGRAFFENREID; R. F. LYON, for plaintiff in error.

WHITTLE & GUSTIN; POE, HALL & POE; NESBITS & JACKSON, for defendants.

MONTGOMERY, Judge.

The facts of the case necessary to an understanding of the points made and decided are succinctly these: Joseph G. Styles died in 1858 leaving an estate worth some $76,000 00, and thirteen children, by three wives, and the last wife him surviving. G. B. Roberts administered on the estate, and owing to counter-claims set up by the different sets of children, found it necessary to file a bill against the distributees for injunction and direction. Pending the litigation he sold all the property of the estate, mostly or entirely for credit. Several of the distributees bought property at the sale, for which they gave their notes, well secured at the time, which notes, by agreement among themselves, were to be held by the administrator until final distribution, and then accounted for as part of their distributive shares. The war coming on shortly after the bill was filed, the case was continued through the whole of it from causes not necessary to notice. In 1866 the issues between the different sets of children were submitted to a jury, and it was determined that they all were entitled to share equally in the estate, certain of them accounting for advancements made by the intestate to them. Under the order referring the issues between the children to a jury, the accounts of the administrator were referred to an auditor. During the war the administrator received all the money due the estate by purchasers, who had not paid before it commenced, in Confederate money, except the amounts due by the distributees who had bought under the agreement above mentioned. He had not collected the notes of the distributees, owing to the agreement, and because he preferred their notes to Confederate money. One of these notes he had, under instructions from the surety, sued, but the suit had been enjoined at the instance of the maker, (the widow,) until her share in the estate could be ascertained and paid. During the war the administrator paid

Roberts *vs.* Summers *et al.*

over to such of the distributees as were accessible to him, and who would receive it, Confederate money, taking care, as, he supposed, not to advance them an amount beyond that to which they would be entitled at the final distribution.    The balance of the money he invested in Confederate securities. This investment was attacked as improperly made, but the report of the auditor sustained the administrator in making it, and no exception was taken to the report on this point.    The auditor made his report, in which he allowed the administrator, as properly invested by him in Confederate securities, $31,280 00, $24,000 00 principal and the remainder as interest.    This, with the expenses of administration and the widow's share of the personalty, (she elected to take dower) the auditor first deducted from the whole estate received by the administrator, (which the auditor found at the time of his calculation, in 1868, to amount to about $113,000 00,) leaving to be distributed among thirteen children $64,679 61, or $4,975 35 each.    But the administrator in making his advancements had treated the Confederate securities as part of the solvent assets of the estate, and had regulated the amount of his advancements to each distributee upon that idea.    He had consequently advanced to each of ten distributees more than by the calculation of the auditor, any one of the ten was entitled to.    The sum of these overpayments, as the auditor calls them, is $10,819 01.    The report hold the administrator responsible for failing to collect the amounts due by the distributees on their notes.    The Confederate securities perished on the administrator's hands.    One of the charges made before the auditor against the administrator was, that he had unreasonably delayed the settlement of the estate by failing to comply with the law in various particulars, and that great loss had resulted therefrom.    The report finds in favor of the administrator on this point, and no exception is taken to the finding.    The Court, however, in the charge to the jury who tried the issues raised by the exceptions filed to the report by the administrator, submits this question anew to the jury. The Court also charged the jury that they could not "con-

sider the investment of $24,000 00 in Confederate securities, or anything connected therewith, inasmuch as the auditor allowed the investment as a credit to the administrator, and no exceptions were filed to that portion of the auditor's report." The Court further charged the jury as set forth in the seventh head-note, and without the qualification there held necessary. One of the items claimed by the administrator, but disallowed by the auditor, is $2,500 00 in Confederate money sent by him to Sallie Summers, one of the distributees, by a person not authorized by her to receive it, and which she declined to receive, but which for some cause, not shown by the record, never came back into the hands of the administrator. The report charges him with this at its nominal value. The rule of reference provides that any exceptions filed to the report shall be tried *de novo*, as in cases of appeal. One of the exceptions filed by the administrator, alleges generally, that the auditor's report is erroneous in its calculations, not specifying any particular errors except results arrived at. All the distributees whose notes the administrator held were perfectly solvent up to the close of the war, but became insolvent by the emancipation of their negroes and destruction of their property by the Federal army. Defendants in error insisted that no evidence could be submitted to the jury that was not before the auditor.

1. The first exception which we consider and dispose of in our decision is the alleged error in the charge to the jury "that the auditor's report is, *prima facie*, correct, and unless plaintiff had shown by proof the same to be incorrect in the matters excepted to, that they would confirm the report." This charge is conceded to be correct as a general rule, but it is insisted that in this case the rule of reference provided for a hearing *de novo* on the exceptions, as in ordinary cases of appeal. What exact force the parties intended this language to have is not very apparent. It would seem to have been intended to evade the force of the English chancery rule, that no evidence, other than that heard before the auditor, is admissible on the hearing of the exceptions to his report. And

section 3571 of the Code gives color to this view.  However this may be, the report ought to be worth something, and it is no great hardship to require the objecting party to take the *onus* of showing its incorrectness, in the absence of more explicit language than that used in the order of reference showing that the parties intended to set aside, for the purposes of this case, the usual rule governing such reports.

2. To say that the results at which an auditor arrives in long matters of account are erroneous, without specifying wherein the error consists, is, in effect, to defeat the object of section 4144 of the Code.    For this reason, we think the sixth exception not well taken.

3. The English rule undoubtedly is, that on exceptions to an auditor's report, no evidence other than that heard by the referee is admissible.  The reason is, that the Chancellor in England has no jury, and the practice is to refer the case back to the auditor or master to hear the new evidence, and report upon it.   In Georgia, our juries in chancery are *quasi* appelate auditors or masters upon the exceptions taken ; and hence the propriety of laying before them all attainable evidence, instead of going through the delay of referring back to the master, again excepting to his ruling, and then, at last, coming back to the jury.

4. We do not think it was a *devastavit* on the part of the administrator to settle with such of the distributees as were willing to receive them at par, in Confederate notes, reserving, as he did, a sufficient amount of the same funds to settle with the others.   Had he invested the whole estate, under proper orders of Court, in such funds, without paying any distributee, and the whole had perished, he could not have been held liable.   How, then, does the fact that he paid some of those very funds over to distributees, willing to receive them at par, create a *devastavit ?*   Indeed, this question is settled by the third point decided in *Davis vs. Bagley*, 40 *Georgia*, 181.   See what is there said upon this subject, on page one hundred and eighty-five.   The whole difficulty, as it seems to me, grows out of an error in calculation on the part of the auditor.   He reports

that the administrator was justified in making the investments in Confederate securities. This, not being excepted to, must be accepted as a controlling feature in the case. He then proceeds to deduct from the whole sum found to be in the hands of the administrator, the current expenses and the amount which was invested in Confederate securities, and then subtracts the widow's fourteenth of the personalty, and divides the remainder by thirteen, *to ascertain the share of each distributee.* This is at once holding the promise to the ear and breaking it to the hope. The auditor here unintentionally violates his own rule, and, in effect, holds the administrator responsible for the amount invested in Confederate bonds to the extent of the unpaid balances due, by his method of calculation, to the distributees who have not been settled with in full. To illustrate: A dies in 1860, leaving property worth $150,000 00, three minor heirs, arriving at age, respectively, in 1863, 1864 and 1866, and a will, by which he makes B his executor, and provides for an equal distribution of his property among his heirs, their shares to be paid to them by the executor as they, respectively, arrive at age. B, under order of Court, invests the whole property in Confederate bonds. When the oldest heir arrives at age, in 1863, the executor pays over to him $50,000 00. So with the next, in 1864. In 1866, the youngest becomes of age, and demands his share. Suit is instituted, the executor's accounts referred to an auditor, who finds the investments all rightly made, and allows B the $50,000 00 which have perished on his hands. Under the rule adopted by the auditor in this case, he deducts $50,000 00 from $150,000 00 first, then divides the remainder by three, and so brings B in debt to the youngest heir, $33,333 00—he having overpaid each of the older heirs, by this method of calculation, $16,666 00. Surely, upon the assumption that B was not in fault in making the investments, he is entitled to have the division made without deduction, and to pay the unpaid share in the securities which have perished without fault on his part. So here, instead of deducting $31,280 00, (the amount of the Confederate securities, princi-

Roberts *vs.* Summers *et al.*

pal and interest,) from the amount found in the hands of the administrator, and dividing the remainder, $64,679 61, by thirteen, he should have divided $95,959 61 (balance in his hands after deducting ordinary expenses of administration and some debts) by thirteen, to ascertain the share of each child. The administrator then would be found to have overpaid nobody. True, he would owe, by this method of calculation, a larger balance to each distributee than found by the auditor; but he would, under the auditor's ruling, that he was not to be liable for amounts invested in Confederate securities, be entitled to pay off these balances with those securities, to the extent of $31,280 00. Or, to be exactly accurate, which requires that the widow's fourteenth of the personalty should be deducted before the administrator is credited with the Confederate securities, the account should stand thus:

Amount of personalty to date of auditor's calculation......... $63,796 21
Amount of realty to date of auditor's calculation............... 50,062 16

Total...............................................................................$113,858 37
Deduct debts, current expenses, etc............... $11,494 56
Retained by administrator for attorney's fees...   1,500 00
Contingencies, master's fees, etc.....................   2,000 00

                                                    2)$14,994 56
Of which charge one-half to personalty..........   7,497 28
  Deduct this from personalty get widow's fourteenth.
Personalty......................................... $63,796 21
Deduct as above stated..............................   7,497 28

                                                   14)$56,298 93
Widow's fourteenth......................................   4,021 35
Add widows fourteenth to current expenses, etc...4,021 35+
14,994 56.............................................................................   19,015 91

Which deduct from sum of realty and personalty funds....... $94,842 46
  to be divided into thirteen shares.

Giving each child $7,295 57, which is to be reduced by the amount of advances received by him or her. The auditor makes the share of each $4,975 35, but leaves no assets in the hands of the administrator to settle with those not yet paid in full. The method here suggested as the proper one leaves the

$31,280 00 of Confederate securities, as assets to meet those claims, and relieves him of the charge of having overpaid any distributee, inasmuch as the highest amount with which the auditor charges him, as overpaid to any one share, is $2,290 14, which is less than the difference between a distributive share, as found by the auditor, and a distributive share as arrived at by the mode of calculation here indicated. The amount of $3,401 98, charged as overpaid to Nathan Hawkins, was paid to him as the representative of two shares, he having married two daughters of the intestate  This way of ascertaining the responsibility of the administrator, also gets rid of the controversy as to his liability for failing to sue the notes of the distributees who purchased property of the estate. For, as the auditor in making up the amount of $113,857 37 in the hands of the administrator, charged him with these notes, so, on the other hand, he would be entitled to pay off the makers with their own notes in settling with them, for their distributive shares, and thus the notes would become, for all purposes, what the auditor makes them in fixing the liability of the administrator, so far as that liability is concerned, to-wit: available assets. The method of calculation proposed would make the aggregate balances due the distributees by the administrator, after those who purchased property had accounted for their notes, about $35,000 00; but as Nicholas Styles, one of them, has been settled with, and as his claim by the auditor's report amounts to $5,067 88, and by this method would amount to more than $7,000 00, the administrator would have more than enough of Confederate securities to meet these demands, except in so far as each heir would be entitled in good money, of course, to his *pro rata* share of the difference between the amount of Confederate securities and the balance due by the administrator to all the heirs. It is to be noted, however, that none of the exceptions taken to the report cover this error of the auditor, assuming it to be such.

5. With regard to the fifth point decided, it is only necessary to refer to section 4144 of the Code to sustain the decision. If the finding of the auditor, that the administrator was

blameless for the delay in settlement of the estate was unsatisfactory to the distributees, they should have excepted to it. Not having done so, they are concluded and the question was not an open one for the consideration of the jury.

6. The investment by the administrator in Confederate bonds, having been allowed by the auditor, and not excepted to, it became one of the established facts of the case, as much so as that the administrator was not blameable for the delay in the settlement of the case, and was to be so regarded by the jury, and as exonerating him to the extent of the amount allowed. They could not re-open that question, and while overruling the report upon all other grounds, confirm it upon the ground that the auditor had improperly exonerated the administrator from liability on account of these investments. The charge of the Court, as we understand it, excluded from their consideration the fact found, which was that the administrator was not to be held liable for those investments. If the jury could not "consider the investment of $24,000 00 in Confederate securities or anything connected therewith," as a fact settled in favor of the administrator by the report, then they might have found this sum unaccounted for (the administrator does not pretend to account for it in any other way,) and while disagreeing to the auditor's report upon all else, have affirmed it upon the ground that here alone was enough to make the administrator responsible for the amount of the notes with which he is charged by the report, and to which charge he excepts. True, this mode of arriving at their conclusion would have been improper, because not covered by any exception. But their verdict would not have shown the method by which it was reached, and the administrator was entitled to have this door closed against them. In other words, the administrator had the right to have the fact of his exoneration on this point considered by the jury in order that they might avoid the possibility of being misled while considering the question of his liability on the points raised by the exceptions. Perhaps the intention of counsel in asking, and of the Court in giving the charge complained of in the twelvth ground for

new trial, was to instruct the jury that no exceptions having been taken to the deduction by the auditor, of the Confederate securities from the assets found in the administrator's hands, the jury could not consider, for the purpose of correcting it, whether that deduction had been properly or improperly made. The reason given in the charge would seem to look obscurely in this direction, to-wit: "inasmuch as the auditor allowed this investment as a credit to the administrator, and no exception was filed to that portion of the auditor's report." If this is what was intended, the language in which it is couched does not convey the idea as clearly as it might have done. It may be added that if, by looking into this matter of investment, it would have aided the jury in arriving at a correct conclusion upon any of the issues submitted to them, we see no reason why they might not have done so. For instance, if they should think that the auditor's report was correct upon this point, and should also be of opinion that there was no practical difference between the investment in Confederate securities and in the notes of individuals, they might very well conclude that exoneration from liability for investing in the latter was a logical sequence from exoneration from liability for investing in the former—the administrator's conduct, of course, being found by them equally upright and prudent in both cases. On the other hand, if they should think, the times considered, that the administrator was not justified in investing in mere evidences of value, they would so find in the issue before them, notwithstanding the auditor, upon a similar issue had thought differently.

7. We think it was error to hold the administrator liable for the loss of notes to the estate because he did not sue them within a reasonable time after they fell due. The evidence shows the investment was as secure as he could reasonably hope to get at the time. Had he collected the money, he must have reinvested in the same kind of security, or perhaps worse. We think the charge should have been qualified as indicated in the seventh point decided.

8. Had the administrator declined to send the $2,500 00 in .

Confederate money to Mrs. Summers, when applied to by Strippling, he could only have been charged with it at its real value at the time it came into his hands, unless he had received it improperly in the course of administration, which is not pretended. Upon what principle, then, can he be charged with more than its real value because he intrusted it in the hands of one not authorized to receive it? We can perceive none. Of course, he is responsible for its true value, but nothing more.

9 and 10. It is unnecessary to add anything to the decision, as it appears in the ninth and tenth head-notes.

Judgment reversed.