WILLIAM P. ANDERSON, executor, plaintiff in error, *vs.* FRANCES A. USHER *et al.*, defendants in error.

1. Where the report of an auditor is allowed and approved by the court without any objection having been made thereto, it is conclusive as to all questions of law which might have been made.   Thereafter exceptions can only be filed to the facts found.
2. A trial before the court by agreement, without the intervention of a jury, does not dispense with the necessity of making such legal points as may be deemed pertinent to the issues involved, and having the decision of the court thereon in the same manner as if the parties were trying the case before a jury, if they desire to have the judgment of the court reversed here for error.
3. There is sufficient evidence to sustain the judgment of the court below affirming the auditor's report.

BLECKLEY, Judge, dissented.

Auditors.   Practice in the Supreme Court.   Practice in the Superior Court.   New trial.   Before Judge HALL. Newton Superior Court.   September Term, 1875.

Robert P. Usher died in 1859.   On the first Monday in July of that year, Wm. P. Anderson qualified as his sole executor, and proceeded to act as such.   On the 6th of February, 1869, Frances A. Usher and others, legatees under the will of Robert P. Usher, filed their bill in Newton superior court, against said executor, charging him with waste and mismanagement, seeking account and settlement, and praying, among other matters, an injunction against Anderson,

commanding him that he cease to collect any debt or demand then due, or to become due to the estate of Usher, and the appointment of Oscar Thomason as receiver, with authority to collect the moneys due said estate, and to manage all the assets thereof. The chancellor read and sanctioned the bill, and indorsed thereon his order, that the writ of injunction do issue as prayed for; that Thomason be appointed receiver of the assets of the estate according to the prayer of the bill, and that the executor, Anderson, within twenty days from the time of the service of the order upon him, deliver over to Thomason all the assets of any kind, in his, Anderson's, hands belonging to said estate, taking Thomason's receipt therefor, and filing in the clerk's office of the superior court of said county, within the said twenty days, a correct schedule of all said assets, verified by his oath. The clerk, on the 8th of February, 1869, issued the writ of injunction in pursuance of said order, and the terms set out in the prayer of the bill. Service of the same, and of the bill, was perfected upon Anderson on the 11th day of February, 1869. The assets of the estate were delivered up to Thomason by Anderson within the time fixed by the order of the chancellor, and Anderson then ceased to act as exector, as by the said order and injunction commanded.

The executor made public sale in February, 1860, of a portion of the lands of his testator, known as the home place. He, by another, became himself the purchaser, and went immediately into possession. This sale was set aside by a decree rendered upon the bill at September term, 1874, and the land returned to the Usher estate.

At September term, 1875, the case made by the bill and answer of Anderson, was, by order of court, referred to Thomas B. Cabaniss as auditor, who heard the evidence, and made his report to the court, as hereinafter set out.

The report having been allowed and approved by the court, it was consented and agreed by counsel that the pre-

siding judge should, upon the hearing of the case on the exceptions to the report, act as judge and jury, both parties reserving all right of exceptions.

The report of the auditor was as follows:

"Complainant introduced Oscar Thomason, who testified that after his appointment as receiver under the bill filed by the complainant, W. P. Anderson, the executor, turned over to him the notes, accounts, money and bonds stated, the receipts exhibited and accompanying the papers returned to the superior court in March, 1869, and that the package of bonds, money, Confederate, State and Mechanics' Bank change bills, exhibited to the auditor, are the same that were turned over to him by the said executor.

"McCormick Neal, sworn, testified that he knew John H. Colbert, was related to him by marriage, he being the uncle of his wife; he was acquainted with the property of the said Colbert before the war, during the war, and some of it since the war. Before and during the war, Colbert was a man of considerable means, having a large and valuable plantation in Alabama (adjoining, or near witness' farm), slaves thereon to work the same, a comfortable home in Columbus, Ga., where his family resided, and other property; was worth before and during the war thirty or forty thousand dollars. Since the war knows of Colbert's still owning his Alabama farm, but is not certain about his Columbus home. Thinks since the war he has had as much as eight or ten thousand dollars worth of property.

"S. D. Hight, sworn, testified that he is acquainted with the Usher home plantation, and would say from his acquaintance, its annual rental value, from 1860 to 1875 inclusive, to be four hundred dollars.

"On his cross-examination, witness testified that during the war, in 1861, the place was worth $400.00, in 1862, 1863 and 1864 worth scarcely anything, as the government seized or pressed all of value nearly that was made during those years on farms: in 1865, was worth $400.00, and an average of $500.00, yearly, since.

"Dr. —— Hendrick, sworn, testified that he had for a number of years a plantation adjoining Usher's home place; that he thinks said place was worth for rent per annum $500.00; that during the war the government pressed nearly all that was made on the farms in the country.

"Complainants introduced bill with exhibits accompanying, including returns of executor prior to and during the war, sale bills and appraisements, also returns annexed to defendant's answer and closed.

"Defendant introduced receipts given by the receiver to the executor accompanying this report, dated March, 1869, and his returns annexed to his answer.

"Anderson, the executor, testified, in substance, as follows: he knew nothing of what was made on the Brewer place, of the estate of Robert O. Usher, until such products were brought to market and sold, and returns were made by him of all these. The produce not sold, raised on said place, went to the support of Mrs. Usher and family. Witness wrote to John H. Colbert frequently about his note, and applied to him for payment, but never sued it, regarding Colbert as good as anybody. After October, 1861, the currency of the country was chiefly Confederate money, and after the same became the currency, collected very little, if any, for the Usher estate in anything else. Interest bearing notes and various bills exhibited were received by him in regular course of administration.

"Received money due him before the war, in Confederate currency, until close of the war. Prudent men generally did the same thing. Has no recollection of saying to Mrs. Usher that he was not bonding any of the money of her husband's estate. Has bonds and certificates of my own. Does not know from whom he obtained any money, or bonds of his own. Harris & Hunter's note was paid 29th day of March, 1863, in Confederate currency. His individual note was paid 20th of March, 1863. Paid for the Usher place, June 30, 1862, $2,000; November 8th, 1863, paid $4,226.55. Did receive the package of money

turned over to the receiver on the Usher estate. Can-
not remember particular claims on which particular bills
were received. Kept estate's money and his own sepa-
rate—did not mingle them. The Confederate money,
bank bills, and state money turned over to the receiver,
were the ·identical bills received for the estate. Might
have loaned the money to parties not very good. Consid-
ered the interest-bearing treasury notes the best investment
that could be made.

"Knew Noah Phillips; was good for his debts. Phillips
& Dearing were good; Joe Maddox considered good. Re-
members Mr. Oscar Thomason calling on him once or twice
for a settlement. Said to him he would be ready for a set-
tlement as soon as he could get papers ready. Never speci- ·
fied any time. Never had an order from the judge of the
superior court to bond any money of the estate. Paid his
own note in Confederate money. Exchanged some of the
money into bonds. Paid the note and interest on it, but
don't remember the amount. Can't say how long he kept it
on hand. Could not distinguish the bills, and cannot say
what he did with them. Cannot say where he got the money
bonded in March, 1864, nor from whom he got the $100
bonds. Don't remember anything about the second bond
exhibited—said bond of $1,000.00. Has no definite recol-
lection of where he got any particular bond. Remembers
getting some bonds in Augusta. Remembers nothing as to
from whom or where he got Mechanics' Bank bills. Can't tell
now, where, when, or from whom he got any of the bills
exhibited. The cash collected in 1859, was in good money.
Cash received from July, 1859, to July, 1860, was in good
money. Also, from July, 1860, to July, 1861. Dr. Bry-
an's note was dated February, 1859. Thinks he was insol-
vent. Made the effort to collect it by asking; never sued.
Note of T. W. Sims, indorsed by Sneed & Stewart, thinks
it was doubtful as to solvency after it came into his hands.
If his returns show that he paid Stewart, then he paid him
money. Jno. Stewart was at one time good for his debts;

36

was so until he became insolvent. Walthal was good for $10. N. Phillips was considered good. All the efforts made to collect, were to let the parties know that he wanted the money; never sued them. Never considered Gen. Rakestraw good for any amount. John O. Freeman was not good; never sued him as it was utterly useless. H. Sims was insolvent a number of years before his death. Don't know when he died. Maddox was good; Judge Harris paid Harris & Hunter's note; paid in Confederate money. Suppose that some of the money paid, is the money paid to the receiver; don't know that there is. Of the money paid by himself, can't swear there are any of the bills in the package. Of the money paid for land, can't designate any of the bills in the package. Money paid for Confederate certificate, can't designate what money paid for it; can't identify a single bond or bill in the package turned over to the receiver. Can't say what time he received Mechanics' Bank bills. Can't tell whether he received said bills on any claims of the estate. So with state treasury notes and Confederate bills. Don't know that he ever made any return of the payments made on the Colbert note. Did not mix any of the estate's money with his own. Received change bills because he thought they were the best money. This was in 1862 or 1863. Can't tell what time, or upon what claim, he received change bills. Had a large pocket-book in which he kept estate's money and papers. Don't know what notes in the inventory were paid before 1863. No money came into his hands at death of Col. Usher; there were some broken bank bills, and no other money.

"John Harris sworn, testified: Cannot remember date when Harris & Hunter note was paid; thinks it was in 1863, and that he attended to the payment of it. The money was in the store. It was paid in Confederate money. Wanted to pay the money when cotton was bought. Usher wanted their note rather than the money. Soon after giving the note, Col. Usher died. Thinks it was in 1863, when the

note was paid. Thinks that as soon as they could do so, they paid the money. Said to Judge Floyd, that they had the money on hand at Usher's death, and Hunter's habit was prompt payment of his debts. The note was paid when there was nothing else but Confederate money. They—that is, Harris & Hunter, had good money at Usher's death, and all along until after the war. Don't think they paid any shinplasters, and don't think they had any considerable amount in one dollar bills."

Here follows a long and intricate calculation, which the auditor sums up in the following

### RECAPITULATION :

"Amount due by the executor on balance due per first return, with interest to March 1st, 1876.. ................$    872 25
Amount due March 1st, 1876, with interest on balance due by executor on second return..... ....................    6,549 32
Amount due by executor on balance third return, reduced to gold value, with interest to March 1st, 1876............    1,960 72
Value of notes inventoried as solvent, not collected, and for which non-collection no good legal reason was shown, or attempted to be shown, by the executor.................    18,047 95
" Rent of home place bought by the executor, and afterwards returned by executor to the receiver, by decree of court, for the years 1860, 1861, 1862, 1866, 1867, 1868, 1869, 1870, 1871, 1872, 1873, 1874, @ $500 per annum...............    8,994 80
" Transactions by returns, not including Confederate money, currency and papers turned over to receiver by executor, show the executor to be indebted, the 1st March, 1876.. ....................................    2,290 81

Total due by executor, March 1st, 1876................$38,715 85

### PER CONTRA.

"Allowing the executor credit for all the Confederate and other war currency on hand at time of purchase of bonds, and after deducting amount due estate by his Confederate returns, as well as what was collected on the Harris & Hunter note, and the individual note of W. P. Anderson, I find the estate due him on Confederate transactions, January 1, 1863, $3,446.67, which, reduced to gold valuation, is $1,182.07, which, with interest according to law, to March 1, 1876, amounts to............................$  2,672 56

"The executor is further credited with amounts turned over
to Thomason, receiver, in 1869, with interest on same from
time the executor received them to March 1, 1876, as in-
terest had been counted against executor on same items
in his returns up to same time, they making in the aggre-
gate..... .............................................. 2,099 51
                                                    $  4,772 07

Gross amount due by executor, March 1, 1876....$38,715 85
Credit as above ..............................   4,772 07

Net amount due by executor March 1, 1876......$33,943 78

" From the evidence submitted and the calculations made
upon the returns of the executor, it is my opinion that the
defendant, William P. Anderson, is indebted to the com-
plainants in the sum of thirty-three thousand nine hundred
and thirty-three dollars and seventy-eight cents, all of which
is respectfully but diffidently submitted."

The remaining facts, so far as material, appear in the
opinions.

CLARK & PACE, for plaintiff in error.

J. J. FLOYD, for defendants.

WARNER, Chief Justice.

The complainants filed their bill against the defendant as
executor for an account, relief, etc. The court appointed
an auditor to examine the defendant's accounts, hear evi-
dence in relation thereto, and make a report thereon, which
was done. When the auditor made his report, as appears
from the record, the same was allowed and approved by the
court, neither party excepting to the judgment of the court
allowing and approving the auditor's report. The defendant
then filed thirteen exceptions to it, which, by the agreement
of the parties, was heard before the presiding judge, who was
to act both as judge and jury in passing upon the same. The
court, from the evidence before it, found against the 2d,
3d, 4th, 5th, 6th, 8th, 10th, 11th and 12th exceptions, and

against part of the 1st and 9th exceptions, as appears from the finding and decree set forth in the record. The only evidence offered before the court, on the hearing, to counteract the report of the auditor, was the following evidence of the defendant himself :

" The Georgia and South Carolina bank bills turned over by me to the receiver were received by me as executor of Usher along during 1860 and 1861. When Confederate money came into circulation in the summer or fall of 1861, these bank bills were commonly regarded, and were so regarded by me, as more valuable, and for that reason I preserved them for the estate. Nobody wanted to borrow money then, and I did not want to lend those bank bills if I could have done so, because I would have had to take pay in Confederate money.

" After Confederate money came into general circulation, which, I think, was in the fall of 1861, I did not get in for the estate, nor in my own business, any other sort until Confederate money went up : it went up in 1865, when the surrender occurred.    John S. Colbert is the brother of Mrs. Usher, widow of testator.   The Usher place was worth very little to me for rent while I had it in my possession—not near $500.00 a year.   I rented it some of the time I had it.   I did not get notes for all of the negro hire for the year 1865. I only got $2,650.00 worth of notes ; for the balance of the negro hire for that year, included in my return, I never got any notes from the persons hiring them ; they were to come and give me their notes, but did not do so.   When the negroes were set free, some of the parties who had hired them refused to give notes.   I did not try to collect money from them, for I thought it was useless.   I never collected anything for negro hire for 1865."

The finding and decree were as follows :

"I find the first exception good in this, that the auditor did not allow the balance in the hands of the executor to be free from interest for the next year succeeding the making of each annual return, as the executor was authorized by

law to hold this balance to meet the current expenses of the estate for the succeeding year.

" I find against the balance of this exception.

" I find against the second exception.

" I find against the third exception. There is an error in calculation on the return to which this exception refers, but that is corrected in this decree by a calculation made necessary by sustaining the first part of the first exception, and the thirteenth exception.

" I find against the fourth exception.

" I find against the fifth exception. There is an error in the calculation on the return to which this exception refers, but the error is corrected in this decree in the manner stated in reference to the third exception.

" I find against the sixth exception.

" I find in favor of the seventh exception. The amount paid is, by this decree, deducted from the return in which the executor is charged with the amount of these notes.

" I find against the eighth exception.

" I find in favor of the first part of the ninth exception. The auditor was right in charging rent, but he erred in charging compound interest on the amount of rent found due annually.

" I find against the balance of this exception. The error of the auditor in charging compound interest is corrected by this decree, in which I have allowed the executor a credit for the overcharge of interest.

" I find against the tenth exception, as the report of the auditor shows that the executor was credited with the amount set out in this exception, and the interest on the same.

" I find against the eleventh exception.

" I find against the twelfth exception.

" I find in favor of the thirteenth exception. I have made a new calculation on each return, and have allowed the executor credit for the overcharge in the way of interest.

"After making the corrections in the auditor's calculations, which were made necessary by sustaining the exceptions

herein sustained, and allowing credits for the amount collected by the receiver, and not allowed in the auditor's calculation, I find that there is due to complainants from Wm. P. Anderson, executor, up to March 1, 1876, thirty thousand and four hundred and seventy-eight dollars and fifty-seven cents, which amount it is ordered and decreed that complainants do recover of W. P. Anderson, with costs of suit."

*March* 12, 1877.

To this finding and decree, Anderson brings his bill of exceptions, saying therein that it is error in this:

1. Insomuch as it finds against the first exception of defendant, Anderson, to the auditor's report.

2. In finding against the second exception.

3. In finding against the third exception.

4. In finding against the fourth exception.

5. In finding against the fifth exception.

6. In finding against the sixth exception.

7. In finding against the eighth exception.

8. In finding against such part of the ninth exception as is specified in said finding and decree.

9. In finding against the tenth exception.

10. In finding against the eleventh exception.

11. In finding against the twelfth exception.

13. In the aggregate sum found against Anderson in said finding and decree.

And for which errors counsel for Anderson say that said judgment and decree should be reversed.

1. By the 3097th section of the Code, it is declared "that in equity causes, the court may refer any part of the facts to a master or auditor, and his report thereon shall be *prima facie* the truth after allowance by the court, either party having the liberty to except. But the final decision upon the facts shall be by a special jury." It will be perceived that the court is only authorized to refer any part of the *facts* in the case to a master or auditor for his report thereon, but if there are errors of law apparent on the face of the report, the court, on objection being made thereto, can correct the

same by its judgment before the report is allowed and approved by the court, as was held in *Brinson vs. Wessolowski*, 57 *Ga. Rep.*, 142. See Code, §3138. If there are no legal objections apparent on the face of the report of the auditor, or if there are, and the report is allowed and approved by the court without objection, then, after such allowance of the report by the court, it is *prima facie* the truth; but either party may except and have the *facts* decided by a special jury, or by agreement of the parties, by the court, without the intervention of a jury, as was done in this case.

2. The court, acting in the capacity of a special jury, by consent of the parties, from the evidence before it, found against the defendant's exceptions to the auditor's report, as now complained of, and rendered a decree against the defendant for the sum $30,478.57. The error complained of in the judgment of the court is, that it found from the evidence before it, against the defendant's exceptions, and rendered the decree that it did. This is a court for the correction of errors, and the party who comes here and complains of error in the judgment of the court below, must affirmatively show the error or errors that were committed by the court on the trial of the cause. *Roberts vs. Summers et al.*, 47 *Ga. Rep.*, 434. A trial before the court by agreement, without the intervention of a jury, does not dispense with the necessity of making such legal points as may be deemed pertinent to the issues involved, and having the decision of the court thereon in the same manner as if the parties were trying the case before a jury, if they desire to have the judgment of the court reversed here for error. If no legal questions are raised on the trial of the case for the decision of the court, the same will be presumed to have been waived, and the parties will not be allowed to raise them here for the first time for the purpose of assigning error in the judgment of the court below.

3. In this case, the record shows that the report of the auditor was allowed and appoved by the court without objection by either party, and was submitted to the court on

the trial of the cause as containing *prima facie* the truth. There was no evidence introduced on the trial to controvert the *prima facie* evidence of the auditor's report but the evidence of the defendant himself. The court had the right to judge of the character of that evidence, and give to it such weight as, in its judgment, it was entitled to, and no more. The judgment of the court upon the evidence submitted to it at the trial, was not so strongly and decidedly against the weight of the evidence as will authorize this court to set it aside for error, according to its repeated rulings heretofore made. There was no decision of any question of law made by the court during the progress of the trial complained of by the defendant, but it is insisted that this court shall go into the report of the auditor, which had been allowed and approved by the court below without objection from either party, and ransack it for the purpose of discovering errors, both of law and fact, for the purpose of reversing the judgment of the court. This court was not organized for the purpose of performing the functions of an auditor to adjust the accounts of executors and administrators, even if it had the time to do so, but to correct the errors that may be committed on the trial of cases in the superior and city courts, when such errors are plainly and distinctly made to appear. The errors which this court can consider and adjudicate are such as are made affirmatively to appear to have been committed by the court below on the trial of the cause, and not such as may be discovered by ransacking an auditor's report for errors, when that report has been allowed and approved by the court, and is, therefore, *prima facie* the truth, and been passed upon by the jury, or by the court acting in the place of a jury, by the consent of the parties. To do so in this case, would be to assume that the auditor's report had been successfully controverted by the evidence of the defendant himself, when the court, by its judgment, acting in the capacity of a jury, has found otherwise. The judgment of the court below, upon the evidence submitted to it, not being so contrary to that evidence as to make it ille-

gal, should be affirmed, inasmuch as the auditor's report, in the opinion of the court, had not been successfully controverted by the evidence of the defendant, thereby leaving it to stand as *prima facie* the truth.

Let the judgment of the court below be affirmed.

JACKSON, Judge, concurring.

The line of statutory enactments seems to indicate clearly that there are two distinct kinds of exceptions to an auditor's report. First, exceptions of law; secondly, exceptions of fact; and these two classes of exceptions are so distinct, and differ so materially, that they are to be tried before different tribunals—the judge to hear and determine matters of law excepted to, and the jury, matters of fact. Code, §§3097, 3138, 3137, 4202, 4203.

In this case there are no separate exceptions of law and fact, but they seem to have been all blended together, making it very difficult to separate the errors of law, if any be charged, from the errors of fact. Section 3138 of the Code, expressly enacts that grounds of objection to rulings of the auditor on the admission and rejection of evidence because illegal, or on any other ground impeaching the propriety of the report, "shall be heard and decided by the court," and that "the report, when finally accepted, shall be admitted as evidence to the jury," with instructions appropriate to each case.

It would seem, therefore, that all errors of law against the propriety of the report must be made before the report is accepted, so as to be evidence to the jury, and these legal points must be settled by the court before the result of the auditor's calculations shall go to the jury. If any of these exceptions, *on legal grounds*, be sustained by the court, then the system is that the case shall be sent back to the auditor with instructions to hear the case over again and correct his report accordingly; and in 47 *Ga.*, 414, the court seems to have adopted this view. There it is ruled that "an analysis

of sections 3042, 3082, 3083, 4143 and 4144 of Irwin's Revised Code (sections 3097, 3137, 3138, 4202, 4203 of the present Code) shows that when an auditor, or master in chancery, makes a report upon matters of account referred to him, the party against whom the report operates may file two classes of exceptions: first, for alleged errors of law on the part of the referee; secondly, for alleged errors in his report as to the facts found.   The first is for the exclusive consideration of the court, under section 3083 (3138.)   The facts found by the report are for the consideration of the court in the first instance, after which, if approved by the court, the report becomes *prima facie* evidence of their truth, subject to be overthrown by testimony before the jury."

The same case decides that " it is not necessary, under our practice, that an auditor should append to his report the evidence on which it is based."   In that case no evidence was appended, so that the report which is *prima facie* evidence, is not a report of the facts, but a report *on* facts ; or, in other words, the result or conclusion which the auditor draws from the testimony before him.

Now, in the case at bar, the report was accepted by the court, and the order accepting it was duly passed and appears of record.   That judgment, so accepting it, closed all questions of law which had been passed upon by the auditor, and left only issues of fact for the jury on the exceptions filed.

So that, strictly in law, if it be considered best to apply strict rules of law to this case, all exceptions of law to the auditor's report had been passed upon and overruled by the court, and issues of fact only were left ; and before the jury on the issues of fact, the report of the auditor on the facts, the results he reached, became *prima facie* evidence, and must control, unless overpowered by other evidence introduced on the jury trial.   Well, no evidence in this case on the jury trial was introduced, except the defendant's own testimony.   That was very confused and uncertain, to say

the least, and the jury had full power to believe or not believe it, as they should think right.

It can make no difference in principle that the judge was made the jury by consent. As judge, acting as the court, he ordered the report to be approved and accepted, before he tried the facts as the jury agreed upon by the parties. Then he took the case and tried it, or should have tried it, as a jury. The result is, that I concur in the general view which is presented by the chief justice, and the conclusion to which he comes, to affirm the judgment on strict legal principles.

Under the application of these principles to the settlement of accounts, the auditor will discharge his appropriate duties and make the calculations, subject to review by the jury, and the legal principles on which he does this duty will be fixed by the court, subject to be reviewed by this court.

But if the legal exceptions, or exceptions of law, can be eliminated from their intermixture with the exceptions of fact, I think, on examining the exceptions thus mixed, these exceptions of law will be found to be but two.

First, ought this administrator to be charged with compound interest, under the facts, where he is so charged? and, secondly, should he have been charged with the notes turned over to the receiver in 1869?

In respect to the first point, on examination of all the facts—those reported by the auditor as sworn to by witnesses before him, as well as that sworn to before the judge acting as a jury—I think that he should be so charged. The estate was certainly mismanaged. One plantation was left to take charge of itself and the executor took no interest in it at all. He could not tell from whom he collected Confederate money, or from whom he got the bonds in which he invested that money. But the regular rule is to charge simple interest for seven years, and then compound, and that is all that was done in this case. As to the statute compounding interest being suspended during the war, it will

be seen that this was done only during the existence of the stay law, and that act was declared unconstitutional, and therefore never did exist. See acts of 1862, p. 30 ; 37 *Ga.*, 124.

In respect to the second point, I think that the presumption is, that these notes could not be collected after the receiver took them. This executor received them perfectly good and solvent, he held them ten years, he made no effort to collect them, and turned them over to the receiver by order of court but a few months before the bar of the limitation act of 1869. It was for him to show that they continued good and solvent till 1869, when he turned them over. This he did not do. Besides, it appears that the most important and largest of them were not good in 1869. Colbert was worth thirty to forty thousand dollars, much of it in Georgia, when the executor got his note, and up to and during the war ; and the witness swears that *he thinks* he had eight or ten thousand dollars of property *in Alabama* left after the war. He was very rich in Georgia for years when the executor held the note. One witness *thinks—only* thinks—him worth eight to ten thousand after the war *in Alabama*, beyond the jurisdiction of the court, and even that evidence does not show what time after the war the witness *thought* him worth this sum *in Alabama.*

Besides, he owed the estate gold debts to a large amount, and paid them to himself in Confederate money when it was very much depreciated, in 1863 or 1864, which was allowed as legal ; and if we depart from strict law and look to broad justice, examining his whole case ourselves, as auditors and jury *de novo*, I am of the opinion, from the closest scrutiny I have been enabled to give the case as disclosed by the entire record, (and I have examined the whole record with care,) that the errors which have been committed by the auditor and court below, if, indeed, any have been committed, in the executor's behalf and to his advantage, are fully as great as any committed against him, if such have been committed ; and that the law has not only been

administered in respect to adherence to strict principle in a re-examination by the court, as a jury, of the auditor's report, but that justice in a broader sense has been administered. I therefore concur in the judgment which affirms the judgment of the superior court.

BLECKLEY, Judge, dissented, but furnished no written opinion.